IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **TYREE SHERRER**, | : | Case No. 1:09cv266 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING IN PART AND |
| | : | DENYING IN PART MOTION FOR |
| **HAMILTON COUNTY BOARD OF** | : | SUMMARY JUDGMENT |
| **HEALTH**, | : | |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant Hamilton County Board of Health's Motion for Summary Judgment. (Doc. 27.) Plaintiff, Tyree Sherrer, brought this action against Defendant, her former employer, alleging that it violated her rights under the Americans with Disabilities Act ("ADA" or "the Act"). Sherrer claims that Defendant disclosed her confidential medical information without permission in violation of 42 U.S.C. § 12112(d)(4) and that it retaliated against her for filing a charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") in violation of 42 U.S.C. § 12203. Defendant has moved for summary judgment on Sherrer's claims. For the following reasons, Defendant's Motion is GRANTED as to Sherrer's illegal disclosure claim and DENIED as to her retaliation claim.

1

## I.    BACKGROUND[1]

Defendant, Hamilton County Board of Health, operates a public agency known as

Hamilton County Public Health.  On January 16, 2007, Hamilton County Public Health hired

Sherrer as a Child Care Health Consultant, Public Health Nurse I, under Mary Sacco's

supervision.  Sherrer's job duties were to provide training and consultation on health and safety

issues to child care providers in an eight-county region of southwest Ohio.  Sherrer's position

was funded pursuant to a grant/contract with the Ohio Child Care Resource and Referral Agency

("OCCRRA").  Of the forty hours per week Sherrer worked, the grant funded thirty-six hours

and  Defendant paid the remainder.  Sherrer worked in a nursing group that consisted of herself,

Mary Sacco, Kathy Tucker, Ann Pleatman, Linda Kimble, Mary Rapien, and the secretary Robin

Fristoe.

### A.    Disclosure

On Christmas Day 2007, Sherrer discovered a lump in her breast during a self exam.  She

told two of her co-workers, Lisa Craig and Robin Fristoe, about her discovery.  Sherrer had a

mammogram on December 28, 2010, and her doctor decided a second mammogram was

necessary.  (Sherrer Dep. 101-2, 104.)  Sherrer had the second mammogram on January 17,

2010.  At that time, Sherrer's doctor informed her that she needed a biopsy and, based on the

result of the biopsy, may need surgery.  (*Id*. at 105-7.)

The following day, on January 18, 2008, Sherrer had a doctor's appointment concerning

a condition unrelated to the lump she had found.  (*Id*. at 115.)  Sherrer had previously filled out a

---

[1]  Except as otherwise indicated, background facts are from Defendant's Proposed
Statement of Undisputed Facts (doc. 32) to the extent they are admitted by Plaintiff in Plaintiff's
Response to Defendant's Proposed Statement of Undisputed Facts (doc. 33).

leave request form for that appointment.  When Sherrer returned to work from the appointment, she entered Sacco's office to adjust the leave request form because the appointment had not taken as long as she thought it would.  (*Id*. at 116.)  Sacco said to Sherrer, "Is everything okay?"  Sherrer responded, "no," told Sacco that she had found a lump in her breast, that she might need a biopsy, that she might have to take time off of work and might need to have surgery.  (*Id*.)

On January 23, 2008, Sacco had a meeting with two nurses under her supervision from a different unit, Judith Beiting and Lisa Craig, regarding the management of communicable diseases.  During that meeting, Sacco and Beiting had a conversation about a former coworker who had been diagnosed with cancer.  Then, Sacco mentioned that Sherrer also had just found a lump in her breast.  Witness testimony is inconsistent as to whether Sacco additionally said that Sherrer might need a biopsy.[2]  Sherrer and Craig are friends, and Sherrer already had told Craig that she had found a lump in her breast.  Beiting has no recollection of the conversation in which Sacco disclosed that Sherrer had found a lump.

Following the meeting, Craig told Sherrer that Sacco had disclosed that Sherrer had found a lump in her breast and was going to need a biopsy.  (Sherrer Dep. 125.)  Sherrer then went to Sacco and asked her if she had shared Sherrer's medical information with Craig and Beiting.  Sacco admitted that she had disclosed Sherrer's medical information and that she realized as soon as she said it that she shouldn't have.  (*Id*. at 127.)  On January 25, 2008, Sherrer filed a charge with the EEOC claiming discrimination in violation of the ADA because Sacco disclosed her "confidential medical information to co-workers."

---

[2]  Sacco testified that she only disclosed that Sherrer found a lump in her breast.  (Sacco Dep. 64.)  Craig testified that Sacco also said that Sherrer was going to have a biopsy.  (Craig Dep. 50-1.)

### B.      Retaliation

In late January 2008, Sherrer was diagnosed with an aggressive form of breast cancer.  In February 2008, she had a lumpectomy, followed by chemotherapy and radiation treatment that continued to August 2008.  As a result of her medical treatment, Sherrer lost her hair.  Sherrer took a total of twelve weeks of leave from work in the spring of 2008 (February 15 through 29, and March 13 through May 30).  She returned to work on June 2, 2008.

### 1.      Expectations Regarding Consultations

The contract period on the grant funding Sherrer's position ran from August 2007 through June 30, 2008. According to the contract, Sherrer had to deliver a minimum of fifty-two trainings to providers and/or parents and a minimum of 194 consultations (by telephone, email, or onsite) to child care centers and family child care homes during the contract year.  When Sherrer went on medical leave in March 2008, she had completed almost two-thirds of the consultations specified for the 2007-08 fiscal year.  (Sherrer Decl. ¶ 9.)  While Sherrer was on leave, Sacco filled in for her by doing consultations if a child care provider called in requesting information.  However, Sacco did not do any cold calling of providers.  (Sacco Dep. 92-94.)[3] When Sherrer returned to work on June 2, 2008, there were seventy consultations left to be completed prior to the expiration of the OCCRRA contract.  Sacco asked Sherrer to submit a plan explaining how she would complete the remaining seventy consultations by June 30.  Although seventy consultations in one month was significantly more than what consultants typically performed, Sacco believed it was "doable" for Sherrer because the consultations could be done by telephone.  (Sacco Dep. 109-10.)

---

[3]  Sherrer asserts that Sacco did little or no consultations during Sherrer's medical leave. (Sherrer Decl. ¶ 9.)

4

During the month of June, Sherrer reported to Sacco that, even though she was making a lot of phone calls, she was having trouble contacting clients and was running into difficulty completing the seventy consultations.  Sacco instructed Sherrer to write down every daycare facility she contacted.  (Sherrer Dep. 195.)  Sacco had never before asked Sherrer to keep such records.

On or about June 24, 2008, Sherrer called Linda Lucas, her primary contact at OCCRRA, and asked her whether failure to complete all seventy consultations would jeopardize Hamilton County Public Health's grant for the child care program.  (Sherrer Decl. ¶ 11; Sherrer Dep. 249.) Lucas did not know the answer to Sherrer's question but relayed the message to Lucas' supervisor, Judith Santmire.  (Sherrer Dep. 59, 249-50.)  On June 24, Santmire sent an email to Sacco indicating that Sherrer had called OCCRRA regarding the consultation goals in the contract.  In that email, Santmire stated: "I am not worried about deliverables this year considering Tyree [Sherrer] was on leave.  I would be more concerned if a consultant was working the hours and the deliverables still were not met.  Please let me know if you have any questions."  (Sacco Dep. Ex. 17.)  Sacco never told Sherrer that Santmire indicated it was not necessary to complete all seventy consultations by June 30.  Sherrer accomplished seventy-four consultations by June 30.

### 2.    Expectations Regarding Direct Service

Sherrer was a Child Health Consultant under Hamilton County Public Health's contract with OCCRRA.  The OCCRRA contract states that "Child Care Health Consultants should spend at least seventy percent (70%) of their time on direct service," defined as "working with child care providers and the community to promote health and safety in out-of-home settings."  On July 7, 2008, Sacco told Sherrer in an email that, while spending seventy percent of time on direct services was "a goal" in fiscal year 2008, it would be "an expectation" in fiscal year 2009. (Sacco Dep. Ex. 6.)  In fact, there had been no change: the OCCRRA contract language specifying that consultants spend at least seventy percent of their time on direct services was identical in contracts for fiscal year 2008 and fiscal year 2009.  (Sherrer Dep. Exs. 9, 10.)

According to Sherrer, the average direct care percentage actually achieved among Child Care Consultants in Ohio was fifty-nine percent.  (Sherrer Decl. ¶ 14.)  Sherrer states that it was difficult to devote seventy percent of her time to direct services because of the administration and paperwork the job required.  (*Id*.)  Despite working very hard to devote seventy percent of her time on direct services, she was able to achieve that goal only one month out of twelve in the 2007-08 fiscal year.  (*Id*.)  Sherrer states that when Sacco told her the seventy-percent figure was an expectation rather than a goal in fiscal year 2008-09, it put additional pressure and stress on her.  She felt that if she did not achieve seventy percent, she could be disciplined and possibly terminated.  (*Id*. ¶ 15.)

### 3.    Additional Scrutiny

On June 24, 2008, Sacco said to Sherrer that she had not seen her do any work since she had returned from medical leave.  (Sherrer Dep. 254; Sacco Dep. Ex. 7.)  Sacco told Sherrer to

write down every day care center she attempted to contact. (Sherrer Dep. 255.) Sherrer asserts that the requirement that she write down this information was unreasonable because the information was available to Sacco in other places.

According to Sherrer, because Sacco was putting an unusual amount of workload on her and accusing her of not working, on June 25, 2008, Sherrer asked Kathy Lordo how show could go about filing an "internal grievance." (*Id*. at 220 and Ex. 59.) This led to meetings between Sherrer, Sacco, Lordo, and a human resources employee named Stephanie Taylor on July 3 and August 5, 2008. (Lordo Dep. Ex. 3.) Sherrer claims that these meetings did not quell Sacco's harassment.

At some point after Sherrer returned to work after medical leave, Sacco told Sherrer that she needed to record her work schedule activity on her computer's "Outlook" calendar. (Sherrer Decl. ¶ 18.) At the July 3 meeting between Sherrer, Sacco, Lordo, and Taylor, Sacco asked Sherrer to put all her activities on her Outlook calendar and include details. Sherrer pointed out to Sacco that she was already including detailed information in the calendar entry, and that Sacco could access the information by "opening" the appointment and reading the detailed information. (Sherrer Decl. ¶ 19; Sacco Dep. Ex. 7.) At the August 5 meeting, Sacco again told Sherrer she was not properly recording her schedule in Outlook. (Sherrer Decl. ¶ 20.) When Sherrer told Sacco in an email that the information Sacco wanted was already in the Outlook calendar, Sacco was not able to identify any missing information. (Sherrer Decl. ¶ 20; Sacco Dep. Ex. 8.) Sherrer's use of the County's Outlook calendar system was consistent throughout her employment; at no point in 2007 did Sacco complain about how Sherrer was keeping her calendar. (Sherrer Decl. ¶ 18.)

7

During the latter part of her employment, Sherrer had a cell phone provided by Defendant.  (Sherrer Decl. ¶ 21.)  Her practice was to have it turned on only during work hours when she was away from the office.  (*Id*.)  On one occasion, Fristoe called Sherrer's County-issued cell phone to tell her that a day care had cancelled an appointment, but Sherrer had turned the cell phone off.  After this incident, Sacco told Sherrer that she had to keep her County-issued cell phone on 24-hours-a-day, seven days a week.  Sacco testified that she believed it was the County's policy to require employees cell phones to be kept on at all times.  (Sacco Dep. 176.)  In fact, the County required only management, not field staff, to keep their County-issued cell phones on at all times.  (*Id*. at 179.)

The day after the day care cancelled the appointment it had with Sherrer, Sacco asked Sherrer how she was going to account for the four or five hours she had not worked the previous day.  Sherrer did not have a response.  Sacco suggested that Sherrer make up lost hours in the future by returning to the office at night.  (Sherrer Dep. 188.)  Sherrer was a salaried employee, so she earned the same amount regardless of the number of hours she worked.  Sherrer claims that Sacco had never before told her that she had to "make up" hours lost due to a client's cancellation.  Sherrer never worked in the office at night; she felt that to do so was unsafe because the office was located in a high-crime area.  (Sherrer Dep. 188-89.)

Sacco gave Sherrer evaluations in January and July of 2008.  Sherrer's January 2008 evaluation was positive, and the written evaluation form completed by Sacco indicated that Sherrer achieved standards in every category of the evaluation.  (Sherrer Dep. Ex. 81 pp. 8-13.)  Likewise, Sherrer's July 2008 evaluation form completed by Sacco was positive and indicated that Sherrer met expectations in every category of the evaluation.  (*Id*. pp. 1-7.)  However, Sacco

said to Sherrer during her performance review that Sherrer was not "irreplaceable."  (Sherrer Dep. 311-12.)[4]

### 4.      Miscellaneous Acts of Harassment

In addition to the above incidents, Sherrer claims that the behavior of Sacco and others created a hostile work environment.  Sherrer alleges that on or about March 13, 2008, Pleatman, Fristoe, and Sacco discussed that Sacco was skilled in using firearms, and Sherrer perceived this as a threat of violence against her.  Sherrer alleges that Sacco deliberately held back work for her to do when she returned from medical leave, noting that on June 27, Sacco forwarded her an email dated April 22 from an OCCRRA staffer requesting a consultation.  Sherrer alleges that she believed Sacco sabotaged her laptop computer and projector, but she has no evidence that the equipment was sabotaged.  Sherrer alleged that Sacco deliberately engaged in unsanitary behavior by sneezing into her hand and then saying she needed to use Sherrer's telephone. Sherrer alleges that Sacco ridiculed her over her hair loss due to chemotherapy, noting a conversation between Fristoe and Sacco in which Sacco saw a picture of Fristoe's daughter's boyfriend and commented that the boyfriend was bald and that it "seems to be the style here lately."

On September 2, 2008, Sherrer filed a second charge with the EEOC alleging retaliation. Sherrer resigned on October 29, 2008, approximately five months after her return to work from medical leave.

## II.      LEGAL STANDARD

---

[4]  Sacco explained this comment in the August 5, 2008 meeting with Sherrer, Lordo, and the human resources employee.  Sacco claimed what she actually said was "no one is irreplaceable," and that she indicated to Sherrer that she should tell daycare providers that they could ask for any nurse to answer their questions.  (Sherrer Dep. 312; Sacco Dep. Ex. 7.)

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.  A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law."  *Id.* at 252.

## III.    ANALYSIS

### A.    Disclosure

Sherrer claims that her supervisor, Mary Sacco, violated the provisions of 42 U.S.C. § 12112(d)(4) on January 23, 2008 when she mentioned in a meeting with Craig and Beiting that Sherrer had found a lump in her breast and would undergo a biopsy and possibly surgery.  The

statute under which Sherrer is suing provides that an employer "may make inquiries into the ability of an employee to perform job-related functions" and that information regarding an employee's medical condition or history obtained as a result of such an inquiry must be "maintained in separate medical files and treated as confidential records."  42 U.S.C. § 12112(d)(4)(B) and (C).[5]

The nondisclosure provisions of the ADA do not govern voluntary disclosures of medical information initiated by the employee.  *Cash v. Smith*, 231 F.3d 1301, 1307-8 (11th Cir. 2000); *see also Ross v. Advance America Cash Advance Centers, Inc.*, 605 F. Supp. 2d 1025, 1033 (E.D. Ark. 2009); *EEOC v. Ford Motor Credit Co.*, 531 F. Supp. 2d 930, 937 (M.D. Tenn. 2008); *Yoder v. Ingersoll-Rand Co.*, 31 F. Supp. 2d 565, 569 (N.D. Ohio 1997), *aff'd with correction*, 172 F.3d 51 (6th Cir. 1998); *Kingston v. Ford Meter Box Co., Inc.*, No. 3:07-CV-270,

---

[5]  42 U.S.C. § 12112(d)(4) reads in full as follows:

Examination and inquiry

(A) Prohibited examinations and inquiries
A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B) Acceptable examinations and inquiries
A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

(C) Requirement
Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

2009 WL 981333 (N.D. Ind. April 10, 2009); *EEOC v. Seven-Eleven of Hawaii, Inc.*, No. CV 07-00478, 2008 WL 4369335 (D. Hawaii Sept. 24, 2008).

Defendant argues that Sherrer's disclosure of her medical information to Sacco was voluntary and that the confidentiality provisions of the ADA were not triggered.  The Court agrees.

This case is similar to *Ross v. Advance America*, in which the court found that the confidentiality provision of the ADA did not protect the employee's voluntary disclosure of a medical condition.  In *Ross*, the plaintiff had bipolar disorder, a fact she disclosed to a co-worker when requesting time off.  605 F. Supp. 2d at 1028.[6]  The co-worker then discussed the plaintiff's diagnosis with another employee.  *Id*.  The *Ross* court determined that the medical information at issue was not obtained under 42 U.S.C. § 12112(d)(4)(B) because the employer did not inquire about the plaintiff's ability to perform job-related functions; rather, the plaintiff had explained the medical condition for which she was being treated when she requested time off.  *Id*. at 1033-34.  As that court explained,

> If an employee requests time off and discloses to the employer a medical condition that necessitates the time off, there is nothing in the ADA that requires, or could reasonably be read to require, that the employer keep that information secret from other employees. It is an ordinary, everyday occurrence in the workplace for an employee to request time off due to a medical condition, and for the employer's supervisor to disclose to other employees the reason for that employee's absence. . . .  Dunn's disclosure was ill-mannered, and everyone agrees on that. But he did not act illegally.

---

[6]  The plaintiff had called her co-worker and said she was having some problems and needed a little bit of time to get on some medication because she had been diagnosed as being bipolar.  *Ross*, 605 F. Supp. 2d at 1033.

12

*Id.*; *see also Cash v. Smith*, 231 F.3d 1302 (11th Cir. 2000) (holding that the plaintiff failed to establish any unlawful disclosures under the ADA based on his supervisor's alleged actions in telling coworkers that employee had diabetes when the employee had voluntarily disclosed that information to the supervisor).

Sherrer asserts that when Sacco asked her, "Is everything okay," Sherrer "took [Sacco] to be inquiring into my medical condition, and whether I might be facing anything that could affect my ability to do my job." (Sherrer Decl. ¶ 6.) Sherrer's presumption that Sacco was inquiring into her ability to do her job does not necessarily mean that Sacco was, in fact, making "inquiries into the ability of [Sherrer] to perform job-related functions" as specified in 42 U.S.C. § 12112(d)(4)(B).

Whether an employer has made an "inquiry" into an employee's medical condition, such that the information then revealed by the employee falls within the scope of protection under the ADA, has been the subject of discussion in several cases. In *Doe v. United States Postal Service*, 317 F.3d 339 (D.C. Cir. 2003), in which the plaintiff's claim arose under the Rehabilitation Act but involved the same provisions at issue here, the court examined whether the employee's disclosure was the result of an employer's inquiry. Doe's supervisor at the Postal Service told him in writing that he would face disciplinary proceedings unless he completed either the FMLA form or a medical certificate explaining "the nature of [his] illness." *Id.* at 344. Doe completed and submitted the form, thereby disclosing his HIV status, and the supervisor then disclosed the plaintiff's HIV status to others. The court found that even though Doe submitted the FMLA request voluntarily, that did not mean that he volunteered his medical diagnosis. *Id.* Rather, by conditioning Doe's receipt of FMLA leave on his submission of

medical documentation, it was the Postal Service that initiated the inquiry into Doe's medical condition. *Id.* Similarly, in *Fleming v. State University of New York*, 502 F. Supp. 2d 324 (E.D.N.Y, 2007), the court found that sufficient facts existed to establish that the plaintiff did not volunteer his health information where the plaintiff alleged that his supervisor called him while he was in the hospital and asked him why he was there. *Id.* at 338. And in *EEOC v. Ford Motor Credit Company*, 531 F. Supp. 2d 930 (M.D. Tenn. 2008), the court denied defendant's motion for summary judgment when the plaintiff's manager demanded to know the plaintiff's medical diagnosis before granting him a schedule accommodation, finding that a fact issue existed as to whether the manager's questioning constituted an "inquiry" under the ADA. *Id.* at 933, 938.[7]

In contrast are cases in which an employee provided medical information to an employer absent a specific demand for the information. For example, in *Cash v. Smith*, the plaintiff disclosed her medical condition to her boss "in confidence" but not pursuant to an FMLA request nor in response to any specific questioning. 231 F.3d at 1303. The *Cash* court found that the provisions of 42 U.S.C. § 12112 were not implicated because the disclosure by the employee was made voluntarily. In *Kingston v. Ford Meter Box Company, Inc.*, 2009 WL 981333 (N.D. Ind. April 10, 2009), the plaintiff disclosed his condition – chronic obstructive pulmonary disease – to supervisors before discussing his need for a reasonable accommodation.

---

[7] The plaintiff in *Doe* had asked his manager for a schedule accommodation so he could participate in a clinical study for persons diagnosed with HIV without negative repercussions at work. The plaintiff first told his manager that he needed the accommodation because of a "medical condition," without going into further specifics. The manager demanded to know what the specific diagnosis was, stating, "I have to know why, actually, to accommodate you when other people are coming and asking for accommodations and I turn them down, why am I going to give you an accommodation?" The plaintiff replied that it was confidential and that there was a stigma attached. The manager said, "In order for me to accommodate your schedule, I need to know what's going on." The plaintiff then told the manager that he had been diagnosed with HIV. *EEOC v. Ford Motor Credit Co*. 531 F. Supp. 2d 930, 933 (M.D. Tenn. 2008).

14

The plaintiff said he had disclosed his medical information to put his employer on notice of his disability and to request an accommodation.  *Id*. at * 10.  The court concluded that the plaintiff "wasn't required to make the initial disclosure to [his supervisors]," thus no reasonable trier of fact could conclude that the confidentiality provisions of § 12112(d) were triggered.  *Id*. at *11; *see also Ross v. Advance America*, 605 F. Supp. 2d 1025 (E.D. Ark. 2009) (discussed supra).

Summarized, courts have allowed claims of illegal disclosure of confidential medical information to proceed to a jury when there are facts in the record demonstrating that a supervisor probed an employee for medical information or conditioned the employee's job accommodation or medical leave on the employee's provision of medical information to the supervisor.  When the employee has volunteered the information to a supervisor absent a request for medical information, courts have granted summary judgment to the defendant on the claim.  The parties do not dispute that Sacco simply asked Sherrer, "Is everything okay?"  Sacco did not ask Sherrer about her medical condition, nor did she require Sherrer was to provide her with any medical information.  Sacco admitted that she should not have shared Sherrer's personal medical information with others.  However, because no reasonable fact finder could conclude that Sherrer disclosed her medical information in response to an "inquiry into [her] ability to perform job-related functions," Sacco's failure to keep the information confidential did not violate Sherrer's rights under 42 U.S.C. § 12112(d)(4)(C).  Accordingly, Defendant is entitled to summary judgment on Sherrer's First Cause of Action.

## B.    Retaliation

On January 25, 2008, Sherrer filed a charge with the EEOC claiming discrimination in violation of the ADA because Sacco disclosed her "confidential medical information to co-

workers." (Sherrer Dep. Ex. 29.) Sherrer claims that after she filed the charge, she was subjected to severe and pervasive retaliatory harassment by Defendant. She argues that the retaliatory harassment culminated in her constructive discharge.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). If, in fact, Defendant retaliated against Sherrer for filing her January 25, 2008 EEOC charge, it violated the ADA.

A retaliation claim under the ADA uses the same framework as a retaliation claim under Title VII. *Johnson v. Cleveland City School Dist.*, 344 F. App'x 104, 113 (6th Cir. 2009) (citing *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997)). A prima facie case of retaliation requires a plaintiff to demonstrate that (1) she engaged in activity protected by the ADA; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Id.* (citing *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009)). "Once the plaintiff establishes a prima facie case, the burden shifts to the defendant 'to produce evidence of a legitimate, nondiscriminatory reason for its actions.'" *Id.* (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)). The plaintiff must then demonstrate that the legitimate reason is pretextual. *Id.*

Defendant does not dispute that Sherrer has satisfied the first two prima facie elements of her retaliation claim, namely, that Sherrer filed a charge of discrimination with the EEOC and that it knew she had filed the charge. However, Defendant contends that it did not take an

adverse employment action against Sherrer or subject her to severe or pervasive retaliatory harassment.

### 1.    Adverse Employment Action or Severe and Pervasive Retaliatory Harassment

Sherrer contends that she was subjected to increased managerial scrutiny, was given an unreasonable workload, and was persistently harassed after she filed her EEOC complaint, which she claims is tantamount to an adverse employment action.  She also claims that her resignation was a constructive discharge and hence an adverse employment action.

To establish an adverse employment action in a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern and Santa Fe Ry. Co., v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405 (2006).  The Court cautioned that "it is important to separate significant from trivial harms."  *Id.*  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

Defendant maintains that each action Sherrer characterizes as harassment was either (1) legitimate work-related direction or (2) manufactured nonsense.  (Doc. 28 at 4.)  A reasonable juror could conclude otherwise.  First, while it is true that most of the things Sacco asked Sherrer to do were well within the parameters of her job responsibilities (such as deliver the number of consultations specified in the OCCRRA contract, write down the day care centers she contacted, and make her calendar available), other requirements do not appear to have been legitimate (such as demanding that Sherrer leave her cell phone on "24/7" and make up lost time occasioned by a

cancelled appointment even though Sherrer was a salaried employee). Whether Sacco actually believed Sherrer was required to leave her phone on or make up work time at night requires a credibility determination this Court may not make.

Second, a reasonable juror could conclude that Sacco's demand that Sherrer complete seventy consultations in June 2008 when she returned from medical leave, despite Sacco's knowledge that OCCRRA did *not* expect Sherrer to meet that goal, was evidence of a materially adverse employment action. The Sixth Circuit has found that giving an employee an increased workload after filing an EEOC complaint and subjecting the employee to heightened scrutiny might constitute a materially adverse employment action. *See Ford v. General Motors Corp.*, 305 F. 3d 545, 553-54 (6th Cir. 2002) ("[T]he record suggests that [the plaintiff] was forced to work harder . . . *after* he filed his EEOC complaint than he was before he engaged in that protected activity. . . . Second, the record supports plaintiff's contention that he was subject to a . . . hostile work environment in which his actions . . . were scrutinized more closely than those of his coworkers and that defendant's management attempted to make his life as an employee unpleasant.").

Sherrer claims that Sacco's requirement that she write down all the day care centers she attempted to contact constituted additional work. Also, while Sacco did not increase the number of consultations Sherrer had to perform, the fact that she was expected to complete the same number of consultations notwithstanding her twelve-week medical leave had the net effect of requiring Sherrer to do as many as four times as many consultations in a month as she had been required to do prior to filing her EEOC charge. Additionally, Sacco's failure to tell Sherrer on June 24 that Santmire indicated it was not necessary for Sherrer to complete all seventy

consultations by June 30 supports Sherrer's contention that Sacco deliberately made Sherrer's job more difficult than it had to be.

Sherrer also claims Defendant took adverse employment action against her in the form of constructive discharge. To demonstrate a constructive discharge, Sherrer must adduce evidence to show that (1) Hamilton County deliberately created intolerable working conditions, as perceived by a reasonable person and, (2) did so with the intention of forcing her to quit. *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Id.* "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).

Whether Sherrer has shown a constructive discharge is a close question. Sherrer felt that she was subject to heightened scrutiny, was given additional work to do, and was deliberately mislead as to expectations. She testified that when Sacco told her that the seventy percent direct services provision of the OCCRRA contract was no longer a goal but an expectation, Sacco led her to believe that she would be disciplined and possibly fired if she did not spend seventy percent of her time on direct services. Because she had only met the seventy-percent goal one month in the prior fiscal year, Sherrer could have reasonably believed that she would be unable to meet this requirement. Sherrer testified that Sacco's criticism of the way Sherrer kept her calendar, used her County-issued cell phone, and accounted for her time led Sherrer to feel miserable at the thought of going to work. (Sherrer Decl. ¶ 22.)

Further, when Sherrer asked Lordo how to file an internal grievance because of Sacco's actions, the resulting meetings with human resources did not improve Sherrer's working conditions.  A jury could conclude that, since Sherrer's efforts to rectify the situation internally did not improve the situation, the foreseeable consequence of Sacco's alleged continued scrutiny and harassment could be Sherrer's resignation.  In consideration of the totality of the evidence in a light most favorable to Sherrer, a reasonable person could conclude that Defendant should have foreseen that Sacco's conduct would lead Sherrer to resign.  Taken together, facts tending to demonstrate Sherrer's increased workload, heightened scrutiny, and constructive discharge are sufficient to satisfy the third prong of the prima facie test of retaliation.

### 2. Causation

Finally, Sherrer must show that there was a causal connection between her filing of the EEOC charge on January 25, 2008 and the adverse employment action.  In order to establish causation, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not" engaged in protected activity.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.  But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

20

Sherrer asserts that prior to filing her EEOC charge against Defendant, she was praised by Sacco and was permitted to work independently with minimal scrutiny of her day-to-day activities.  Plaintiff filed her EEOC charge on January 25, 2008.  She was on medical leave from February 15 through 29, and from March 13 through May 30.  She returned to work on June 2, 2008.  Immediately upon her return to work, Sacco told Sherrer to submit a plan detailing how she would perform the remaining 70 consultations before June 30.  Toward the end of June, Sacco told Sherrer that she had to write down all calls she had made to day care providers, and Sacco failed to tell Sherrer that OCCRRA did not expect her to complete all seventy consultations.  On July 3 and again on August 5, 2008, Sacco told Sherrer that she was not properly recording her activities on her Outlook calendar, even though Sherrer's use of the calendar was consistent throughout her employment.  On July 7, 2008, Sacco told Sherrer that spending seventy percent of time on direct services was no longer "a goal" but "an expectation" when in fact the contract language had not changed.  On or about September 3, 2008, Sacco told Sherrer she was required to keep her cell phone on 24/7 when in fact there was no such policy.  According to Sherrer, Sacco did not criticize her for any of the above acts until after she filed her EEOC claim and returned from medical leave.  In short, Sherrer filed her EEOC charge, went out on leave, and returned to work in an environment that was hostile in comparison to the time prior to her filing of the EEOC charge.  The immediacy of Defendant's allegedly harassing conduct toward Sherrer after the charge is sufficient evidence of causality to establish a prima facie case.

### 3.  Burden Shifting

Under the framework set forth in *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 802 (1973), one a plaintiff has demonstrated a prima facie case of discrimination, the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions. "Once the defendant has articulated a nondiscriminatory reason for its decision, the presumption of discrimination that arises from the plaintiff's prima facie case disappears and the plaintiff must have the opportunity to show that the defendant's proffered explanation is merely a pretext for discrimination."  *Weigel v. Baptist Hospital of East Tennessee*, 302 F.3d 367, 377-78 (6th Cir. 2002).

Because Defendant's brief in support of its motion for summary judgment only addresses the prima facie case of retaliation, the Court would be forced to speculate as to what evidence or argument Defendant would set forth in order to articulate a nondiscriminatory reason for its actions.  Accordingly, the Court's analysis of Sherrer's harassment claim ends here.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (doc. 27) is GRANTED as to Plaintiff's claim of unauthorized disclosure of confidential medical information in violation of the ADA and DENIED as to Plaintiff's claim of retaliation.

IT IS SO ORDERED.

　　　　_____s/Susan J. Dlott_____
　　　　Chief Judge Susan J. Dlott
　　　　United States District Court